Cite as 2020 Ark. App. 385

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-20-154

| | |
|---|---|
| THOMAS LOCKE<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | Opinion Delivered September 9, 2020<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26JV-18-273]<br><br>HONORABLE LYNN WILLIAMS, JUDGE<br><br>AFFIRMED |

### BRANDON J. HARRISON, Judge

Thomas Locke appeals the termination of his parental rights to his three children. (Tayler Griffin, the children's mother, also had her rights terminated, but she is not a party to this appeal.) Locke challenges both the statutory grounds for termination and the circuit court's best-interest finding. We affirm the circuit court's order.

On 29 August 2018, the Arkansas Department of Human Services (DHS) received a safety-assessment request from the Garland County Sheriff's Department. Deputy Bowerman reported to the family-service worker (FSW) that Griffin and Locke had left an inpatient drug-treatment facility and were attempting to retrieve their children: three-year-old TL, one-year-old DL, and three-month-old CL. The children had been staying with their paternal aunt, Cheryl Johnson, and paternal uncle, Tony Locke, while the parents were in treatment. According to the deputy, both parents appeared to be under the influence of

"mind-altering substances" and were acting erratically. The FSW eventually convinced the parents to leave the children at Tony Locke's residence overnight. Family members reported that before the parents entered treatment and the children went to stay with relatives, Griffin, Locke, and the children had been living in a van, which had been impounded on August 23.

The next day, August 30, DHS exercised emergency custody of the children. The petition noted that the children had been removed from Griffin's physical and legal custody and Locke's physical custody, since he was the putative father at that point. The circuit court authorized the emergency custody the next day and later found probable cause to continue custody with DHS. The probable-cause order found that Locke is the biological father of the children and appointed him legal counsel.

In October 2018, the parties stipulated, and the court found, that the children were dependent-neglected based on neglect and parental unfitness. Specifically, the court found that the children suffered from neglect

> in that the parents failed or refused to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being . . . [T]he family was living out of their vehicle which was impounded by law enforcement and the family was homeless and the parents refused any services or help from the Department and law enforcement.

Locke was tasked with a number of requirements, including remaining clean and sober, submitting to random drug screens and a drug-and-alcohol assessment, completing parenting classes, and obtaining and maintaining stable housing and employment.

A review in January 2019 revealed that Locke had partially complied with the case plan and the court's orders and had made "some progress toward alleviating or mitigating

2

the causes of the out-of-home placement." Another review in April 2019 made similar findings; however, the court also found that Locke had tested positive for amphetamines and methamphetamine, had not maintained regular contact with the children, and had not obtained stable housing.

The circuit court entered a permanency-planning order on 8 August 2019; that order states that the court "accepts the agreement of the parties that the goal of the case shall be authorizing a plan of adoption." The order stated that Locke had made some progress but not "significant and measurable progress toward the original case plan goal of reunification."

On 4 September 2019, DHS filed a petition for termination of parental rights citing two grounds: (1) the children had been adjudicated by the court to be dependent-neglected and had continued to be out of the custody of the parents for twelve months, and despite meaningful efforts by DHS to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied; (2) Locke is found by a court of competent jurisdiction, including the juvenile division of the circuit court, to have subjected any child to aggravated circumstances. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*, (ix)*(a)(3)(A)* & *(B)* (Supp. 2019).

At the termination hearing, the DHS caseworker, Angela Davis, testified that the children had been removed from their parents because the parents had been homeless and had substance-abuse issues. She stated that the children had now been out of the parents' home for fourteen months. Davis explained that the parents had completed most requirements of the case plan but that DHS remained concerned about the lack of appropriate housing. As of the previous week, according to Davis, the parents had been

3

living in a motel. Davis had since learned that Griffin was living in a barn, and she was unsure where Locke was living.

Davis also expressed DHS's concern about the parents' work stability; Griffin was now on disability, and Locke had worked several jobs throughout the case. Locke had most recently worked for a carnival, but he no longer had that job. Locke reported that he had been performing day-labor jobs, but that employment had not been verified by DHS.

Davis opined that there were no other services that DHS might offer to the parents. As to housing, Davis explained that Griffin had qualified for HUD housing, but because Locke has a felony conviction, he was not eligible to live in a HUD apartment. The couple looked for a house but could not afford to pay first and last month's rent.

Davis agreed that the parents had resolved their drug issues, and the court interjected that "the only downfall that we're dealing with in regard to these two parents is housing and I'm really interested about the housing issue." Locke's attorney asserted that his client needed additional time to obtain stable housing and that he was entitled to additional time because DHS had failed to provide services. The court indicated it would entertain that argument if counsel could connect it to lack of housing. Davis acknowledged that the parents' psychological evaluations had been done later than required by the case plan and that some psychological issues, such as conflict resolution and stress management, might affect the parents' ability to perform normal adult living responsibilities. But she did not agree that a delay in obtaining a psychological evaluation kept the parents from obtaining appropriate housing.

4

Kathleen Armstrong, an adoption specialist, testified that she had obtained 203 potential matches for the children as a sibling group, and she agreed that she did not anticipate any difficulty in finding an adoptive home for the children.

Locke testified that he was currently working day-labor jobs but that he had plans to work full time with his brother's window-cleaning business in Kentucky. He planned to relocate to Kentucky when he completed his outpatient treatment, and he wanted the children to live with him there. Locke testified that he would be able to acquire housing for himself and the children, that he could take care of them by himself, and that he would cooperate with DHS so it could evaluate his home and confirm that it was safe for the children. He said that he and Griffin were no longer a couple. On cross-examination, he confirmed that he had been staying with his mother for the past several nights after he and Griffin had an argument.

The court found that there was "no stable housing at this very moment where I could send the kids back," and because of that, there had been "no cure to the situation which led to the removal." Thus, the court found that it was in the children's best interest to terminate parental rights. The circuit court's written order found that "the circumstances which led to the juveniles being removed from the parents have not been corrected in that the parents still do not have suitable or safe housing." The court also found little likelihood that continued services would result in successful reunification. In addition, the court found that the children are adoptable and that the lack of suitable and safe housing demonstrated that the children would be at risk of potential harm if returned to the parents. Locke has appealed from this order.

5

A circuit court's order that terminates parental rights must be based on findings proven by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3); *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is proof that will produce in the fact-finder a firm conviction on the allegation sought to be established. *Dinkins, supra*. Proof of only one statutory ground is sufficient to terminate parental rights. *Gossett v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 240, 374 S.W.3d 205. On appeal, we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Dinkins, supra*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit judge to assess the witnesses' credibility. *Id*.

Locke first argues that when DHS exercised emergency custody of the children, he was only the putative father and did not have legal custody of the children. He claims that "[w]hile custody is a general term that can mean either physical or legal custody, the legislature specifically distinguishes when it means physical custody by noting such." Locke asserts that Griffin was the "sole parent of the children at that time and removal can only be attributed to her actions." Thus, he contends, DHS pled the incorrect statutory ground as to him; it should have pled the failure-to-remedy ground that applies to noncustodial parents, found in Ark. Code. Ann. § 9-27-341(b)(3)(B)(i)*(b)*.

DHS responds that Locke's assertion is belied by his admission during his psychological evaluation that he and Griffin had been married for five years, which includes

6

the time period in which all three children had been born. Thus, he was a custodial parent at the time of the children's removal. The exact language from the psychological report reads as follows: "He has been with Ms. Griffin for 4½ years. He was married for five years and is still married." Locke replies that DHS has misconstrued those two sentences and that the statements do not support an inference that he and Griffin are married.

We hold that the custodial-parent failure-to-remedy ground does apply to Locke, although not for the reason cited by DHS. We see no convincing evidence to support the argument that "custody" always means legal custody unless the legislature uses the term "physical custody." Locke's own argument acknowledges that custody is a general term that can mean either physical or legal custody. There is no dispute that the children were in the physical care and custody of both Locke and Griffin when they were removed. Thus, we hold that it was not erroneous to apply the statutory subsection that applies to custodial parents to Locke.

Second, Locke asserts that even if the custodial-parent failure-to-remedy ground applies to him, DHS failed to present sufficient evidence to support this ground. Locke argues that the prevailing issue at termination was his lack of housing but that "[a]n impediment to obtaining housing for a majority of the case was Mr. Locke's need to first address his mental health and substance abuse issues and then the need for cash assistance to get into an appropriate home." Locke argues that because DHS delayed providing appropriate services to address his drug addiction and mental-health issues and then failed to offer him cash assistance for the extra charges related to obtaining an appropriate home,

7

DHS did not make reasonable efforts, and termination based on the failure-to-remedy ground should be reversed.

In response, DHS asserts that the circuit court made reasonable-efforts findings in the January and April 2019 review orders and the permanency-planning order, and Locke failed to challenge those findings. DHS also contends that Locke failed to previously request cash assistance, so his argument that he did not receive this service is not preserved. In support, DHS cites *Peterson v. Arkansas Department of Human Services*, 2020 Ark. App. 75, at 11, 595 S.W.3d 38, 44–45, which presented a similar situation:

> Although Franklin may have raised a services argument at the TPR hearing, he failed to challenge any of the circuit court's prior reasonable-efforts findings, and he failed to request any of the specific services that he now claims were necessary to remedy the cause of removal; therefore, he has waived any services argument on appeal.

Finally, DHS notes that Locke also failed to maintain employment as ordered by the court and that the income from employment could have assisted him in obtaining housing.

We hold that clear and convincing evidence supports the circuit court's finding that Locke failed to remedy the cause of removal, namely, a lack of safe, stable housing. Because we are affirming on this ground, we need not address Locke's argument as to aggravated circumstances. *See Gossett*, *supra* (proof of only one statutory ground is sufficient to terminate parental rights).

In his final argument, Locke challenges the potential-harm prong of the circuit court's best-interest finding. In making a best-interest determination, the circuit court must look at all the circumstances, including the potential harm of returning the children to their parents' custody, specifically the effect on the children's health and safety, and it must

8

consider the likelihood that the children will be adopted. Ark. Code Ann. § 9-27-341(b)(3). The harm referred to in the termination statute is "potential" harm; the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *L.W. v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 44. The potential-harm evidence, moreover, must be viewed in a forward-looking manner and considered in broad terms. *Id.* Potential harm includes a child's lack of stability in a permanent home, and a court may consider a parent's past behavior as a predictor of future behavior. *Gonzalez v. Ark. Dep't Human Servs.*, 2018 Ark. App. 425, 555 S.W.3d 915.

In its order, the court found that "the fact that the parents still do not have suitable or safe housing demonstrate how the juveniles would be at risk of potential harm if returned to the parents." Locke acknowledges his struggle with housing throughout the case but argues that the evidence did not demonstrate that the children would be at risk of potential harm if returned to his custody. He also asserts that he was bonded with his children and complied with the majority of the case plan and courts orders; in his words, he ultimately had his parental rights terminated because "he could not afford the additional fees required to get into a rental home." He contends that he had made meaningful progress toward reunifying with his children and that he should have been given a short amount of additional time to obtain stable housing on his own. In response, DHS argues that potential harm was shown not only from Locke's failure to obtain and maintain stable housing but also from his failure to maintain stable employment and financial stability.

The goal of section 9-27-341 is to provide permanency in a child's life in circumstances in which returning the child to the family home is contrary to the child's

health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. *Meriweather v. Ark. Dep't of Health & Human Servs.*, 98 Ark. App. 328, 255 S.W.3d 505 (2007). A child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Dozier v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 17, 372 S.W.3d 849; *see also Latham v. Ark. Dep't of Human Servs.*, 99 Ark. App. 25, 31, 256 S.W.3d 543, 547 (2007) ("[T]he trial court did not err in terminating Latham's parental rights to B.L. where Latham failed to prove that he could provide for one of B.L.'s most basic needs—a stable home."). In this case, the children had been out of the home for fourteen months; and on the day of the termination, Locke had no home of his own and was planning to move out of state. We hold that the circuit court did not err in its potential-harm finding.

Affirmed.

VIRDEN and BROWN, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.